The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention for the Court is now sitting. God save the United States and this Honorable Court. Mr. Cook? I didn't want to do this. Excuse me, Your Honor.   I have a motion to adjourn. Under the Fourth Amendment, police may act to protect the public and themselves from imminent harm. As the Supreme Court said in Brigham City, the role of peace officers includes preventing violence and restoring order, not simply rendering first aid to the casualties. Under the Fourth Amendment's reasonableness test, the critical question when you have as important a government interest as you do here is that you have an appropriately tailored response aimed at reducing the danger that is limited in its intrusiveness. And the steps the officers took to reduce danger here to the public and themselves was appropriately tailored and limited in its scope. Counsel, can I ask you a question? It seemed to me, I guess, that the Court and Terry already struck that reasonableness balance. And so I guess I'm asking, is your position that, as an appellate court, we can sort of look at all of the circumstances and kind of calibrate the balance on the facts of this case in a way different than what the Court did in Terry's? Yes, Your Honor, and I think that is really a fundamental point about the doc final framework here. When you go to exigency analysis, the Supreme Court has said that this is a totality inquiry and that the factors that the Court has used in creating doctrines like Terry, which is the factors you see in cases like Brown that come up in other cases, which is the importance of the government interest, the severity of the public intrusion on privacy, and the tailoring that has to occur, that test is employed in the exigency cases. And I think one of the clearest examples of that is a case cited in the majority opinion before the panel in this case, which is Illinois v. MacArthur, which is an exigency case. The facts are pretty removed from here. Illinois v. MacArthur is a case where the police discover that somebody in your trailer has evidence of drugs, and they hold the person outside while they go and get the warrant. And it's an exigency based on evidence destruction, which is pretty far removed from here. But analytically, what the Court does in that situation is they, without citing Brown, but using those factors to apply them. In this case, it's not just exigency that was used to decide this case. Special means was added to it. And that wasn't argued below on appeal. Is it your position that exigent circumstances constitute a special need, or would you concede that the two doctrines are separate? Well, I would say they're distinct doctrines for sure. But bear in mind that, as I was just saying, with the exigency doctrine, you're applying the general reasonableness test. And it would be surprising if, looking to special needs, which is further application of that test, that you're going to have some kind of conflict because the exigency test is the overarching reasonableness test applied to particular circumstances. Counselor, can I just follow up, and then I'll stop? But I mean, the Court did apply the balance, the reasonable balance you're talking about in Terry in a case that, unlike McArthur, is exactly on point because the concern there was that people were armed with guns and about to use them in public in the middle of the day in a crowded bank. And the Court, looking at that particular exigency, people with guns about to use them said, we understand this is an exigency, and therefore, with individualized suspicion, the police may take action. And so I am concerned, as a lower court judge, that you're asking me to sort of redo the Court's work. No, I don't think I'm asking you to redo the Court's work because the exigency test asks you to apply these general factors. And what sets this apart from a typical Terry case, Terry is a case that's going to cover a huge range of offenses. It could be even jaywalking, far removed, whereas exigency asks you to look at the danger. And without a significant danger like you have here, it's going to be readily distinguishable. Counsel, wouldn't... Sorry, it's over here. It's hard to tell. Wouldn't Lidster give us that answer in the context of checkpoints? Because Lidster says, if it's a law enforcement purpose, like Terry, then we look at the Edmonds test and you have to do that. But if it's not a law enforcement, if it's a public safety issue, for example, as exemplified in Lidster, then instead we don't look to the same analysis. We look instead to whether it is reasonable in light of no reasonable suspicion. Isn't that the distinction that's being drawn? That Terry applies in a traditional law enforcement role where the context we're talking about is not, it's a public safety issue, and Lidster tells us that that is different than the traditional law enforcement role. Right. I mean, Lidster cites specifically Brown and applies it in a context-specific way to factors. And it says, look, we're talking about a very serious crime. Somebody was killed by a motorist, a person who was on a bicycle, and it allows you to incorporate this very serious danger. I think another case that is very helpful to bear in mind when you're talking about danger as a critical conceptual piece of the analysis is the Supreme Court's opinion in Michigan v. Tyler, which is the fire case. You can have fires where the whole notion of criminal wrongdoing is absent and the idea of particularization about a person who committed a crime is missing, and yet police or firemen can, of course, act. And to use an example, if the police were to enter a floor of an apartment building and there were eight doors there, the hallway is filled with smoke, they wouldn't be in one apartment that might be the source of the fire, so we just can't do anything because the Fourth Amendment has protection, rightly so, of homes. They're entitled to act in that kind of a scenario, and it's just an application of this balancing, and why is that permitted? Well, because the... Is that making a checkpoint case, then, is that what you're saying? No. No, I think that... I think the critical thing to focus on here is when you go to apply the factors from Brown, and I keep calling it Brown, but there's so many cases from the Supreme Court that use these tests, this general balancing test, that probably in this number, you just call them Brown, but you're looking at the severity of the government interest, which is really high when you're talking about imminent loss of life, and then the degree of privacy intrusion, and sometimes in exigency cases, the privacy intrusion will be pretty high, and so the Supreme Court in its recent drunk driving cases has been wrestling with when you can do blood draws, and that's obviously a very intrusive step, and so the Supreme Court has Well, it's a collection of facts. It's the five to six shots, they arrive within 35 seconds. While they're approaching, they don't see anyone, then they see right up, right with where they think the gunfire originated, five to eight men within... How do they know where the gunfire originated? Did they stop all... Did they stop everybody? They stopped the five to eight people out in the field, and... Five to eight is what the... I thought you said five to six a while ago. I'm sorry if I... I don't know. I'm sorry. But another really important fact here is when the officers arrive, they see somebody who they think was shot, and... So did they go to render aid to that person? They did. That was Officer Fitzpatrick. Officer Gaines was the one who, and O'Brien were the ones that interacted with the defendant. Was he shot? He was not shot. But the Supreme Court has said in a host of Fourth Amendment contexts that reasonable mistakes of fact are not sufficient to make the police officer action unreasonable. Does it make any difference that, unlike in Lister, the officers in this case seem to hone in on particular individuals as opposed to stopping everyone within a defined area? I think that that does become important in situations that are not an emergency situation. So for example, the reasonableness test would permit, you know, everyone that comes into the court today goes through a metal detector. There's a degree of searching there that is permitted as a background balancing of reasonableness. And in that kind of a setting, the fact that it is applied in a general manner is important to the analysis. But when you're responding to a defined emergency, it's important that, and this really falls out of the tailoring requirement, out of the balancing test, that it be limited in scope and directed toward, you know, reducing the danger. So anytime shots are fired, regardless of whether or not the officers know that shots are being fired at someone or there is actually an imminent threat, shots being fired is enough to just search anyone in the area? No, that's, in fact, that would illustrate an error in applying the balancing test here. So if shots fired in a particular area, if shots were fired out in the country without, and it's not a high-crime area, then you don't get to search everybody. But if it's in a high-crime area, that makes it more imminent? I don't think it is whether it is out in the country or in the city is the distinction that matters. What matters is that the circumstances support the inference. I thought you were using the high-crime area to support you. I mean, it matters here, but that's because you're always looking at... Here, you're talking about this was a high-crime area. That's the reason the police officers were there, right? Right, right. My point is... Wouldn't the analysis be the same if it was, let's say, a college campus or perhaps a place of worship, right? A rural location where shots are often fired for very legitimate reasons. I mean, it's not that the rural city or high-crime, non-high-crime, but the context in which it occurs, if it's a place of worship or if it is a university or if it's a housing area, any of those would suggest to us that those shots are not being fired for legitimate reasons, right? Exactly. I think analytically... I think that's the rule, and I take the point. Why wouldn't a shopping center qualify? It seems to me it's wherever there are a lot of people. Yeah, I think it's... Your rule applies. Yeah, I think... No, I think it's more than that. The issue is... And this question, I think, really goes to the first factor, which is the strength of the government interest. You need to have sufficient evidence that people are in danger here. Well, if there are a lot of people in a shopping center, I mean, you're saying your rule wouldn't apply there? No, what matters is not the particular location, but the collection of facts that lead you to the conclusion that people are in imminent danger. Well, I thought in response to the question from my colleague, Judge Richardson, that you were making the distinction between the country, not people, and places where there were people. So, all places where there are a lot of people, your rule applies? No, I think the point here is that it is not the location. It is whether the particular facts and circumstances suggest that people are in imminent danger. The facts are established. Shots are fired, and there are a lot of people. What else do you need? What else do you need? Those are the particular facts. Right. Well, in many... Well, those are not the particular facts. I mean, you're not going to see that. The facts were that there were 911 calls. There were five or six shots. The officers were within throwing distance of it. They got there in 35 seconds. There were people fleeing from it. They observed somebody who they thought had been shot, and they were in a high crime area. Now, when you have all of that, the officers could reasonably perceive there's danger. Exactly. And so, you don't look at one fact and say, that's automatically danger, or another fact and say, that's automatically danger. You look at the totality and say, was this a dangerous situation? Is that your answer to my question? That is exactly right. So, everything Judge Nehemiah just said is what we put into the calculus becomes your test, correct? It's a totality test. But I was going to say, everything that Judge Nehemiah said, that's your position, that's what it implies. Right. Okay. Was the person stopped running from the scene? He was walking away, but that's... He was walking away. He was... What do you mean walking away? He was walking home, perhaps. Away from what? He was walking away from the location of the gunfire. They don't know the location. He was pointing back and said, I mean, by the time they stopped, their shots were over there. And like a good citizen who's trying to help the police, I think he was trying to tell them, I'm checking on my nephew. Instead, they jumped on him rather than Norman. You would say, where was it, sir? Can I help you? You duck down, I'm going to help. Instead, he becomes... What are you talking about about him running away? All of the facts that... That's all the facts. We all saw the video. He wasn't. He was standing way over there and he put his hand up and he said, over there. And by the time he saw his nephew, they're all over him. Herman, the collection of facts here provided sufficient basis for the officers reasonably to conclude that the people on the scene were in danger. If we were to uphold the district courts here, what options would the officers possess to defuse the situation? Assuming that we rule this kind of action off balance, what options are the officers left with to determine the danger and to defuse the situation? Or is the only option really just to completely stand down? The district court's conclusion was that what the officers should have conducted was a consensual encounter. And I think it's important to note that precedent has established that the kinds of circumstances here where the officers, the steps that they would take to try to protect themselves and control the scene, such as being assertive, having their weapons ready, those are steps that are, by themselves, going to start... Is a consensual encounter a realistic way of dealing with this situation? It is not, and I would point the court to a number of dangers that would arise. What are the problems with taking a consensual encounter approach? I think that among them are, first, hesitation by officers when they arrive on the scene of gunfire, where it's reasonable to conclude that the police and the public are in danger of imminent harm. It is very time-consuming, isn't it? It is. To go individual by individual by individual and have a consensual encounter for every single time you ask someone to raise their hands. So my concern is, if we rule this option out of bounds, do we leave the officers with any plan B or any kind of effective alternative, other than to essentially stand down and wait and let another homicide occur? I mean, if they can't do this, what can they do? And in answering Judge Wilkerson's question, answer the question, is that the issue in this case? I think it is because hesitation by the officers here can result in death and injuries to the other, the officers themselves can be killed by a lack of precautions. What about these people? What about these people who are walking along in the field, they weren't running, no furtive gestures, no reaching, no suspicious activity? What about them in particular gave the officers the right to seize them? Well, I think that's a very important question. Let me finish if I could, Mr. Cook. You've been talking about generalities and the fact that these shots were discharged on Walcott Place, some way over, lots of buildings in between, a field, and the officers were concerned. Good enough. But what about these people gave them the right to stop them? I haven't heard anything that these men were just walking along, minding their own business. They were coming from that area, but nothing about them suggested that they were armed and dangerous or involved in criminal activity. Right. And that's where I think the tailoring part of the brown factors is particularly important. And you're talking about a very limited intrusion, both in terms of visual inspection to figure out who is armed, which is key, the main thing the police can do to reduce the danger here and ensure that no one else is harmed. It is very short in duration. From the time the police step out of the police vehicle to when this defendant, one of the officers said the gun is on him, about one minute. And after that, they are not detaining other people on the scene. So the scope of this intrusion is quite limited. And the tailoring is, I think, also important that these people were ones who could pose a danger. Wow. Wow. You said these people were those who could. Right. Why these people? Well, because as they're approaching, they don't see anyone else around. The five to eight men on the field are the ones that are in closest proximity to where they reasonably believe the shots originated. Oh, I saw a person pass by in the foreground and moved on, and they went way to the background to get this guy across the field. And did the record tell us that, that they're the closest people? That's what I couldn't understand. So the record says that as they're approaching the scene, they do not see. So they get there within 35 seconds. But even before that 35-second point, they're looking at where they think the shots originated. And so they actually are gaining information about what's happening before they even get there. They get out of the car, and they see five to eight people walking away from where they believe the shots are originating. They see the man who they think may be injured. And in order to make sure that there isn't further violence ensuing, where you've got somebody who even appears to have been shot, which certainly ratifies their sense that they are at the right location, they are then, let's find out who has a gun, which is a very limited and directly relevant step. But all of these Fourth Amendment cases come down in the end to a balance. And isn't the balance here a limited stop in the area of an active shooter situation on the one hand versus the prospect of another homicide on the other? And when you balance, nobody wants any infringement of any kind. I understand there's a privacy interest here. But when you balance a limited stop in the area of repeated gunfire against the prospect of another human being losing his or her life, where does the weight on the scale lie? Is there anything in this record that tells us that somebody lost their life because of this gunfire? No, but... Do we know even that the defendant here was, in fact, the person who fired the gunshots? No, but, Your Honor, under cases like Hein versus North Carolina, the Supreme Court has reiterated that reasonable mistakes of fact are not a basis for... I quite understand that. But earlier when we were talking about the facts, we wanted to be clear that we were... Earlier we were talking about the fact that it's taped. I just wanted to be sure... He says a limited intrusion. A limited in terms of what? What was limited by? Time? It was limited by time and the scope. Unfortunately, in this country, too many times it doesn't take much time for a stop, particularly an African-American male, to be fatal to them. It doesn't take very long. So when you talk about a minimal intrusion, that's relative, isn't it? It is. As you said, these people. I would direct the court to a Fig versus Schroeder, Judge King's opinion, and that was a case where a person was shot on the scene and the court said, based on the need to conduct their investigation of the shooting incident in a reasonably safe environment, the initial half-hour detentions of the Figs constituted a measured and proportionate response. That was a group of four people who were related to the shot individual who the officers had a reasonable basis to believe could pose a danger. So at least you had consanguinity to be connecting the small group of people. They knew a person. That's right. In this scenario, the police were responding to gunfire. Five to six shots. It was in the dark. In the problem, we're going to have to determine who are these people that the Fourth Amendment somehow is less than. That's the only thing I saw you say. These people there mean that you could search them. That's what I said, basically. You said these people are there. They weren't running. There was no indication of involvement in crime.  And then instead, he's besieged because he was one of these people? I think that it's important not to lose sight of what, as we pointed out in the record, a woman said right after the homicide that occurred 11 days earlier. She said, I have a young child. I live in this community. I don't want to be ducking bullets. The best way to try to address that concern is to have police respond quickly to shootings and protect people from gunfire. When the police do that, they need to be able to ensure that people are there. If there's a shooting, they were shot, fired. It was five to six gunshots. Let me ask you on that because I made this point in a previous case, and I think you described it the way I was saying it, but I'm saying this arises naturally from the position you're taking. What you've said, essentially, is that there are circumstances here. Every one of them arise from the fact that there are shots fired, as Judge Packard just alluded to. And it doesn't matter if it's a high-crime neighborhood because you don't want to say people in a high-crime neighborhood have less constitutional rights, as Judge Richardson said. You could be out in an open field. So it comes down to the essential fact you've got five shots fired in a crowded area because they have guns. They have a right to have guns all over the country. And sometimes guns go off accidentally or go off voluntarily. What I understand you to say is if officers get those gunshots, at that point, everybody in that whole area there then becomes subject to being searched or seized. That's correct, right? Under these circumstances, there's nothing else. You can go running to the scene. You can say it's night. All of that doesn't matter if there are not shots fired. The central fact here is there were five or six shots fired in a crowded area. Everything else, if you want to go to Judge Neely, gave a litany of other things, but every one of those things arose from the fact that the shots were fired. 9-1-1 call, all of that came from shots fired. And any time shots are fired, there's no injuries here. Nobody just knows. It's just law. What arises from this is you are subject to being searched. It doesn't matter where you live. Anybody who walks around can be searched. Isn't that correct? I would disagree in the following sense. How many of them were subject to being searched? If you couldn't have searched five to eight, how many could you search? You said you disagree with the five to eight. So how many could be searched? Four to five? Three to four? How many of the five to eight could you search? My disagreement was not on the number of people to be stopped and the degree of intrusion. My disagreement is here the facts that suggest that there's immediate danger to people on the scene are more than what Yaron was describing. That was my question. You're really hitting on it, right? What are the facts beyond the fact there were five or six shots fired in a neighborhood? I mean, what are the facts? I mean, everything arises from that fact, does it not? There is the man who appears to be shot that they reasonably believe. After the shots are fired, which is what gets them in the neighborhood. He appears to be shot. He's not shot. And you know this before the other guys are searched, right? No. By the time they figure out he's not shot, as I said, the detention of the defendant So someone holding their arm in an area, that's enough to, well, tell me, does it happen at that point? At that point. And you didn't do it? It's always going to be a totality inquiry. That's not going to make it a fact then. I don't want to get lost on a legal term, totality of circumstance. I agree. But totality of circumstance has an underlying basis of fact. And all I'm asking you is what are those facts? I know the law. Right. And so if the fact is there are five shots, a man is holding his arm, is that it? Is that the totality? Or you've got to keep getting more? No, but I think this reflects the kind of divide and conquer approach that the Supreme Court has repeatedly said. No, no, no, no. In the totality of circumstance. This is the Fourth Amendment. This is the Fourth Amendment and it implicates Second Amendment rights. Everybody has a right to own a gun if you do it lawfully in certain places. Guns go off all the time. I don't say they go off five or six times. It could happen. But you shoot a gun five or six times in any area. I want to know what then gives rise to be stopping everybody in that area. And all I'm seeing is if a guy is holding an arm, police rush there, if it's night, at night, and you can search, you can do this. What else did it take? There was a homicide here 11 days earlier. So it does go back to the high crime area. No. So only in a high crime area if shots are fired. But not in rural West Virginia, small town West Virginia, where I do hear shots all the time fired, especially during hunting season. What really matters is that a reasonable person, considering all of the facts together, would conclude that there is an imminent danger. In other words, what you're arguing, as I understand it, is that it would not be an appropriate analysis to take an individualized fact, whether the gunshots or one person is injured or whatever, but to look in the circumstances and to see whether those circumstances provide a reasonable conclusion that there is danger afoot. And in this case, you had the high crime area. You had a homicide in the area. You had five or six shots. You had people in the community complaining on 911 calls pursuant to those shots. You arrive in the scene in 35 seconds. You have five to eight people walking away from the location. You have one of them that looks injured. And the intrusion is simply a flashlight on the person and telling him to lift his shirt to see if there's a gun in the waistband. That's exactly right. You only searched one person? There were gunshots fired on that particular day. I'm not disputing anything Judge Leibow just said. I just want to be clear. Even a homicide happened two weeks or a year earlier in a neighborhood. I want to know what it is in a neighborhood, and it shouldn't matter that it's over in Creighton Court, which is a high crime area. They're not second-class citizens over there. I want to know when you're in another area, there's a citizen who's walking on anywhere in the street where there are five or six shots being subject to the same kind of circumstance. Because you can build a patch from that. You can have police run all over the place and you have them yelling. Police weren't yelling and make it just as horrible as it can be, but it comes down to the fact there were five or six shots fired. And why don't you just admit? If you shoot a gun five or six times, you just lose rights. You do not just lose rights. But that's obviously a very important fact. You assured me, too, as you do here. If you walk anywhere around here and shoot a gun five or six times, police go around searching on these streets right now. The same kind of thing will come up. They know there's shots. You've got a courthouse near here. You've got all these other circumstances. We can search. I want to go back to my original question. Are you basing your case on exigent circumstances or a combination of exigent circumstances plus special needs doctrine? Which one? The exigent circumstances doctrine covers this scenario. Are you saying that exigent circumstances includes the doctrine of special needs? What I'm saying is that the exigent circumstances doctrine requires you to apply the balancing test. Forget balancing. I'm asking you what theory is your case. Is it based on exigent circumstances, special needs, or a combination of the two? Exigent circumstances provides the balancing test that allows what happens here. You see that same balancing test applies. You're not answering the question. I'm trying to. Well, it's very simple. Is the doctrine of special needs included in your defense of this activity? That's part of it. It is not, but it is not in that sense mutually exclusive. No, no, no. We're not saying they're mutually exclusive. We just want to understand what the rationality are. Right. As I understood from your papers, your first reason was that there was no reasonable articulable suspicion. The district court rejected that, and you have abandoned that argument, right? That's right. Right. And your second argument was, no, we have exigent circumstances. Right. And is that the argument that you are proposing today? That's right. And you never have argued special needs. Is that right? That's right. Although I don't think it's... I understand you think they're related. Yeah. But if we are purists, you know, I mean, just give us that benefit of the doubt. The doctrine that the government asserts here requires is exigent circumstances. Is that correct? That is correct. Thank you. And I think that when you look at how the court has applied exigent circumstances, you see that the court is doing the kind of analysis that allows you to look at the degree of the danger, how tailored the response is, the level of intrusion on privacy interests, and perform a balancing. Can I ask a follow-up to what Judge Niemeyer described as, at least at first blush, a fairly compelling case perhaps for reasonable suspicion? And you just told Judge Motz that you had conceded that issue and you didn't think that the record, at least the government suggested the record didn't support it. And I want to go back to what Judge Harris earlier told you about, discussed with you about Terry. I mean, the reason we have Terry is to give officers a reasoned basis for wanting to stop or believing they can stop somebody to investigate. And as Judge Niemeyer has just described these facts, it seems like there was a case to be made there. You didn't make it. And getting back to Judge Wilkinson's question about the balance, it seems to me that once the officers arrive on scene, they have performed part of that duty to protect the public against a future prospective homicide. And then the balance begins to shift to the individuals who are being intruded upon. And you say these intrusions were minimal. You know, that's all in the eye of the beholder. And that's what Terry is supposed to protect against. So why are you asking us to carve out what I believe to be a new rule of law when it seems like the tools at hand might have been sufficient? I don't think we're asking the court to carve out a new rule. And exigent circumstances has always been available in situations where there is a danger or a risk of destruction of evidence. And that does not exclude, it doesn't go away when there may be criminal activity afoot. I think a good example of this and why exigency is important is, for example, the Palacios case out of the Second Circuit, where it's showing that in that case was individualized suspicion as to everyone who had been seized. Would really not be tenable. But this case is different because you said that these individuals were coming from the area where the shots were fired and so there's a narrowing that occurs as a result of that. That's not Palacios. That's exactly right. And I think that that's an important point. We're not saying that the police could have seized people who were not in a location where they could pose an immediate danger to people. And so this is not dragnet. You're saying you couldn't search all eight of them? No, all eight could be stopped. And those who were stopped and showed their hands and convinced the police officers there in the dark that they did not have a gun were immediately let go. And they kept going about their business because the officers had been assured that, to a sufficient degree, that they were not a danger to the people. How many guns did they find? They found the gun on the defendant. Billy Curry. Right. And they may have found more. Did they stop after that one gun? That's right. That was the end of it. That was the end of it. So they assumed that nobody else had a gun? There was only one gun. They assumed there was only one gun and we stopped. And they may have been wrong in that, but that was a cautious Fourth Amendment approach. Well, if there were five-day shots, there could have been five-day guns. There could have been multiple shooters. It might be a cautious Fourth Amendment approach, but it wasn't an approach that protected the public, which is what this is certainly all about. It was an approach that they thought reasonably balanced the level of intrusion against what was needed to protect the public. But there's only intrusion of one person now and one gun. Right. But it would be interesting. They're going to make, as I understand from your argument, very unobtrusive approaches to the various people that could keep on making these unobtrusive approaches. No, I don't think that's right. Because there were multiple shots. I don't think that's right. I think that having arrived on the scene, tried to control it in a brief amount of time, the danger at that point had abated for them to have said five minutes later, you know, you over there, stop, you know. I thought this was all going on simultaneously. It was. So what I'm saying is the power under exigent circumstances would disappear fairly quickly, I think, because the danger this court could say had abated at that point. It would have been a reasonable, articulable suspicion. Right. At that point, you might be in the wrong. If you have a gun on one person in the field, why not the other? That would increase your reasonable, articulable suspicion, wouldn't it? Well, then you would be more in the nature of a case like Ibarra. Well, sometimes they're shooting at each other. That's the reason the first one's shooting. He's afraid he's been shot at. In fact, if you find one gun, it increases, as Judge Mott said, answers if there's more than one. And if they stop somebody and he said, yeah, actually there was a dispute between the guy in the blue jacket and the guy in the red shirt and they were shooting each other. Did the gun they found, was it found loaded? Your Honor, that's not in the record. I can tell you the answer. Well, I know it's not in the briefs or it's not in the, at least I looked at their two opinions before I came in here to try to see that. It's not in there anywhere. It didn't come out at the hearing? No. Nobody knows whether it was loaded or not. Well, it's known, but it's not in the record, Your Honor. I'm not going to tell you. That's what I'm getting at. I appreciate it. Can I give you a chance to address a concern that has sort of arisen for me as you've been dealing with these questions? So the court in Terry thought it was very important that police officers have clear rules that could guide them when they were in the field like this. And at first I thought you were asking this court to do sort of an ad hoc reasonable misbalance in a way that was different than the way the court did it in Terry. But now it sounds you're suggesting every police officer in the field is going to do a rough and ready Fourth Amendment reasonable misbalance every time they make a decision. Isn't that precisely what the court was trying to avoid in Terry? That you don't leave it to officers in the field to figure out, hang on, I'm thinking about the Brown balance and I think I can stop this guy but not this guy even though there were five shots. That's how you get into this mess that we're having right now. What's wrong with just going with Terry rules which is designed precisely for situations where the police have reason to believe there's a gun that presents an imminent danger to the public? And I will just add, the last time I heard a conversation a lot like this one, it was that oral argument in the J.L. case where the court was asked to make an exception to Terry for gun cases because guns were so dangerous. And it was so hard for you to do consensual encounters or otherwise address the danger posed by guns. And the court explained in the case, we already did this in Terry. We're not doing it in Terry as the rule for guns. Right. And the point I think that Your Honor is missing in that description of the doctrine is that the Supreme Court has expressly in the context of exigent circumstances said we're doing this balancing. And that is not a surprising result because exigent circumstances, you're dealing with a scenario that is inherently about improvisation. It is an emergency situation. And what drives us home I think and shows you how doctrinally this fits with what the Supreme Court is doing is look at the use of force cases. The use of force cases ask you as a starting proposition that the officer has to take into account the danger of the offense. You don't get to use a use of force for possession of marijuana. You absent more. You need to know exactly what the Brown balancing test asks you about, the degree of the government interest, the severity of the intrusion, and how well it's tailored. And so exigency, it should not be a surprise, ends up working similarly to use of force. These are just scenarios where the police have to have latitude. And you bear the price of a doctrine that has less clarity at the starting point. And I think that when you're talking about police response. You don't agree with the suggestion that Terry somehow eliminated the exigency doctrine. In other words, they really addressed two completely distinct circumstances. Under one, if the officer has reasonable suspicion that somebody is committing a crime or has committed a crime, he can allay that suspicion, particularize suspicion. But in the exigent circumstances doctrine, the officers can address the public safety in circumstances where it acts in a tailored response to the safety until it dissipates. Or as you say, in this case, the exigency basically subsides. But these are highly factual circumstances. And I gather your whole argument here is that in all the circumstances that faced these officers that night, they concluded that there was a dangerous circumstance. And they responded to it by picking five to eight people who were walking away from the scene and simply asking them to show their waistbands to see if they had guns. And one of them happened to have a gun. And he's charged with that independently. But the question is, was that response a tailored response to the danger, not to a particular suspicion of a person? Exactly. And I would go back. May I mention one thing? I'm concerned about the fact that you keep talking about the circumstances as a general proposition. But they only really had evidence that there may have been a misdemeanor committed. Did they not? Discharging a firearm in a public place in the Commonwealth of Virginia is a Class I misdemeanor. They did not have any other evidence that anything other than a misdemeanor had been committed. Did they? Oh, that, I think, completely drops out the- Well, I'm just interested in how that affects your analysis. Because discharging a firearm is a Class I misdemeanor. And a firearm can kill a person, right? That's right. And the person who appeared to be shot gave the officers plenty of reason to believe that something more serious was afoot. I think that if any one of us had been in that place- I asked you earlier. I've been going around talking about that. This is about the firearm. If you don't want to do it, I'm okay with it. But just recognize this all comes from Class I misdemeanor, or as Judge Niehaus said, it can kill a person. Well, that's what this is about. It's about shooting in a neighborhood. All these other facts are facts that arise running around yelling. The fact that a person killed 11 days ago just makes it a high crime neighborhood. We already said we're not going to hang our head on that because that would make them second-class citizens. So it's about shooting shots in a neighborhood. And if that's the case, just say it. We advance with all these other facts, get cute with things like totality of circumstances, and apply them restrictively and selectively to various neighborhoods, and then we go to another neighborhood and all of a sudden we all of a sudden get religion again, and we go back and say the former means what it means. Say what it says. Five or six shots in a neighborhood means you then are going to lose some rights. Ms. Cook, I'm going to let you respond to Judge Wayne, and then we're going to finish. Go ahead. No, respond to Judge Wayne. No question. The five to six gunshots are a very important fact here. But it is also the case. If you take that fact out, you wouldn't be here. Correct. If you take that fact out, they wouldn't have gone there, you wouldn't have anything. That is the fact. It may be that you say you can't parcel things out, but you can add a bunch of nothing facts and you're still going to get nothing. But to make it sound all good to say you've got all these other things here, but the fact is there were five or six shots, and without that fact alone, it wouldn't happen. That's all I'm saying. Right. If this had been a report about a fist fight or a stabbing, it would be a very different scenario. But the other facts are really important, and you don't view one fact in isolation. I agree. They're important if you want to reach the result that is here, because then you've got to build up on something. You don't want to say it, but what you ought to just own it to what it is. It is a fact of five or six shots being shot in a neighborhood. That's it. Once you get there, we can have a whole bunch of facts. I can make up every one of these facts. Every time five or six shots are made, I can find you a bunch of other facts to go with it and call it totality, total assertion, but really it's five or six shots. I would disagree with a lot of parts of that. I do think that the five or six gunshots is very important, but I would not treat the other facts as irrelevant, and I think it's not true that they're always going to arise. Agreed. Thank you, Mr. Cook. Ms. Platt. Good morning, Your Honors. Sorry. Good morning, Your Honors, and may it please the Court. I'm Caroline Platt, on behalf of Applee Billy Curry. I may start by noting this case is about the suspicionless seizure of a person, and here is the bright-line rule.  I'd like to make three preliminary points in response to my friend from the U.S. Attorney's Office's argument. Can I just address right here at the outset, because you've announced the direction you're going, which is basically the Terry analysis, and the government is not relying on Terry at all. The government's relying on the notion that there was a dangerous situation threatening the public's safety, and that is a totally different doctrine, and so I hope you keep that in mind and don't take us down. We all know Terry very well. My next point, Your Honor, was about to be about the accident circumstances doctrine, which my friend has now- No, I'm focusing it more. It is not just the doctrine. It's the fact that the officers and the government now are relying on a dangerous situation threatening the public's safety, and the question is, under the reasonable standard, did the officers respond appropriately? And that is not a Terry situation, and it doesn't raise the Terry issues under the Fourth Amendment. Fourth Amendment is simply reasonableness. Well, so, Your Honor, as I said, my colleague has now confirmed Terry is waived, and so is special needs. This is an accident circumstances case, fully. The only question- No, I don't agree with the last one from what he said. Special needs is something that has a similar type of analysis. His suggestion is that exigency is the best fit under finding reasonableness, and so it seems to me it's much more fruitful if you're going to answer the government, is to point out that this was not a dangerous system to the public's safety in these circumstances, or that it wasn't properly tailored, or the response was too intrusive. If I may, Your Honor, the government misapprehended the law in two respects, specifically to that point. The first one is that in the exigent circumstances cases, I counted seven since Brown v. Texas was decided. I can list them if you like. The Supreme Court has never cited Brown v. Texas in any of its exigent circumstances cases since Brown was decided in 1979. If you want me to list them, I can, or I can file a letter tomorrow. Well, does that mean now the police officers, because they've never cited it, police officers can ignore dangerous circumstances in the community which threaten the public's safety? In other words, because they don't have an individualized suspicion of a particular person, yet they know there's an enormous danger facing the public. They have no ability to respond except under the Brown doctrine. No, Your Honor, I'm talking about my colleague's misapprehension of the law. I'm not talking about the police officer's actions. And so, as I said, I believe that Mr. Cook misstated the law, and I'm trying to help the court recognize that. I'm sorry, I want to get to him. I'm sorry. To clarify, I want to make sure I understand. I thought, and he can say this when he gets back up, I guess, I thought I heard him say that the court did not cite Brown but actually used the Brown factors. Is that correct? I don't think it is, Your Honor. My understanding and my recollection is that when the Supreme Court uses the Brown factors, which it does, those are the special needs cases, not the exigent circumstances cases. And those special needs cases are cited and relied upon by the government, and it's brief. Yes, but they have now confirmed, and it has always been my understanding, that certainly at the district court, they are only relying on exigent circumstances. And if you look at the Supreme Court's case in Giardinello and also in Siegel, the United States, as the appellant, cannot rely on new exceptions on appeal, especially when that appellant is the United States government. The Supreme Court has noted explicitly that the United States cannot add a new force amendment exception to appeal. It was in the appellant brief. Right, but it was not in the district court brief that they relied solely on the exigent circumstances exception, and my colleague confirmed that today. And so back to, as I was saying, the Brown versus Brown case has those two special needs and not exigency. May I ask you a question? What are the officers supposed to do in this kind of situation? I mean, what options do they have in order for individualized suspicion to arise? I mean, it struck me that the most likely situation for individualized suspicion to arise was for another crime to occur or for another homicide to occur because a homicide and a crime, you know, from the commission of a crime. So is the option here that you're leaving the offices with to sit back and stand by, await the commission of another crime, await the commission of a homicide, which they'll be even closer to, and that will provide the individualized suspicion? Certainly not, Your Honor. And I have seen, and I know Your Honor has seen, many, many, many Terry stops of health where a crime was not committed and the crime was not witnessed. There's furtive gestures, nervous behavior. I mean, how is the individualized suspicion to come about? Again, Your Honor, everyone in this room sees these cases every day where just in the course of talking to and or just observing people, police officers gain reasonable suspicion under Terry without a crime being committed. There's dozens if not hundreds of cases that this court sees every day. Excuse me a minute, but they're going to conduct interviews? I mean, most of those Mendenhall cases were situations where there was no emergency and where an officer approached an individual on the street in Mendenhall and said, Are you willing to talk? And they're proceeding at a leisurely pace. But these people here, these officers here, are under intense time pressure, and they don't have time to just sit by and talk, and then if someone's nervous, that's not going to be enough because people are going to say, Well, anybody would be nervous in a situation in which the police are talking to them. So I don't understand how they get individualized suspicion in a situation where all the alternatives are immensely time-consuming. Getting consent person by person by person, that takes time. Having an individualized conversation, that takes time. They're operating in an emergency here. Your Honor, as I said, under Florida v. Royer and many other cases, police-citizen encounters will frankly have been the law before the government requested this new application or exception. So you have that. They can find the 911 callers who are clearly willing to talk to them. They can look at cameras, they can talk to security guards, they can look for physical evidence, and they can gain a reasonable suspicion that frankly is not a very high bar to gain. This is what the police have been doing for the 52 years since Terry. It's not that difficult to gain reasonable suspicion if you're the police. Ma'am, do I understand that your argument comes down to the fact that if they don't have reasonable suspicion for a particular person in this case, they can't do anything? That is not my position, Your Honor. Well, that's what you're leaving me to believe. In other words, these officers did not have individualized suspicion because they were confronting a dangerous circumstance. And so the question, the facts to them presented what they call a dangerous public safety. So they do not know any given individual who could have committed that, at least they could not satisfy Terry. And so the question is, if they can't satisfy Terry, do they just have to sit and wait for a crime to occur? I think, Your Honor, that's exactly right. I know, but you're sitting there constantly talking about, well, arguing that they do need the individualized suspicion, and I'm suggesting to you if they don't have it, tell me what the officers can do. I think I just listed eight or nine things, Judge Wilkinson, that they can do. And there's only one thing that they cannot do, which is violate the Fourth Amendment. Tell me what they can do. I want to know how they address this danger. How do they come in under the facts of this case, where we have a shooting in a neighborhood where there had been a homicide before, there were 991 calls that night complaining about it, they're 35 seconds away, they know exactly where it came from, they drive up 35 seconds there, and they see eight people walking away in the field in front of them from the scene that they believe occurred, and they stop these people and see if they've got a gun. Now, they didn't have suspicion of any one of the eight. They didn't have any suspicion of one of the eight, but they were just basically trying to address the public safety concern. And you're saying they can't do that because they didn't have suspicion. Some of the facts you just described are contrary to the record. I just want to note that I'm not conceding that those are the facts on the ground in this case. For example, the factual finding of the district court is that the officers did not know where the shots came from with any precise location. I thought so, too. Page 275 of the Joint Appendix. They drove up the field, they heard the shots, and they drove up the field. They were two and a half blocks away, and they got there in 35 seconds. So they didn't have precision as to what apartment, but they knew it came from Walcott direction. General vicinity. General vicinity. But not location. I know, but that doesn't diminish the dangerous circumstance. But, Your Honor, in that there's no reasonable suspicion as to Mr. Curry, who's the only person whose rights are at issue in this litigation, Mr. Curry is not a danger to them because Mr. Curry is not suspicious. We don't know that. We don't know that. He's at the scene, and he's walking away from the location, and they see five to eight people, a limited class of people walking away, and one of them seems to be injured. This is what the officers observed. So this is another finding of the district court. There was no reason. The court found that it was quite likely that there were other people that were just equally nervous on the other side of the building that could have walked the other direction or driven away. But that focuses on individual suspicion. I'm suggesting to you they don't have to go around and identify which person is in danger. They're trying to address the public safety in a reasonable manner. Now if you say they didn't act reasonably, they should have stood there and watched. And as I've listed, many things they could have done. The only thing they cannot do is seize a calm, peaceable pedestrian without suspicion because that's a violation of the Fourth Amendment. Ms. Pratt, all the many things you think they could have done, they all take an enormous amount of time, and the Supreme Court has always recognized that when you really have dangerous situations or exigent situations, that there is actually some flexibility in the Fourth Amendment rules because it derives from the reasonableness at the heart of that amendment. You take a case like Warren v. Hayden, which was written by Justice Brennan, who is as eloquent a champion of Fourth Amendment rights as anyone I know, and he said normally you don't enter a house without a warrant. But he said the exigency of the situation requires flexibility in the rule. Now there was suspicion in that case. I know, I grant you. But the point I'm making with respect to Warren is that the exigent circumstances allowed the officers to proceed, even though it's as fundamental as anything to the And here in Warden, they did not have a warrant, and the court says, all right, exigent circumstances, they don't need one. If I may, Judge Wilkinson, the first point I wanted to make is this. The exigent circumstances exception has excused the need for a warrant, as you know, to enter a home in several cases and in the paradigmatic examples. But no application of the exigent circumstances exception has ever excused the need for suspicion. In every case, there's some version of particularized suspicion. There's no suspicionless action in the circumstances case that has excused police action by the Supreme Court or this court ever. But the court has suggested that. I want to follow up on the question because it seems to me, following the line of questioning here, I'm not a fool to disagree where it's going. Someone goes in front of this courthouse, shoots five or six shots at people out there. Someone got killed two weeks ago out there. And police officers come in, and nobody's shots come. Why come they can't search everybody on that street? I mean, who are walking around? We know that people own guns. You have a concealed weapon permit. I got that. I mean, the whole bit. There's guns all over the street. If you would stop, you'd find guns everywhere out there on that street because ownership of guns is something we do. And that's okay. That's legal. But to fire the shots, as Judge Keenan pointed out, that's a misdemeanor. And once you fire those five or six shots, why in the world can they not stop you because these officers are looking out for their safety? The public's safety is at aim. I could get shot if they don't do this. Why not? The only answer I have to that question, Your Honor, is that because there is no – Because it's no different than that crime area over there. I want to make sure that's clear because the crime, we just don't want to make people who live in crazy doors second-class citizens because they happen to live in a crime area. And I don't want people who walk around to feel like they're going to be searched just because they live there as opposed to another area. So put it in front of this courthouse. The same thing. And I must agree, I don't understand why the public safety is not implicated in that to stop and just search people. It's a simple thing. Well, the Supreme Court has never recognized such an exception. That's never happened, Your Honor. But I do agree, whatever rules the court chooses, whether this court or the Supreme Court, is going to apply in front of the courthouse and in downtown Falls Church just as equally as it does in Creighton Courthouse. How do these five or six shots apply to everywhere, not just over the Creighton Courthouse? Yes, sir. That's the important thing. Everything that's going on here, if we take out Creighton Courthouse, it can happen anywhere. In front of this courthouse, it doesn't matter. How do these five or six shots, my good friend suggests, well, it may well have been a misdemeanor. Is that really realistic that in a crowded area, you're firing five or six shots in the middle of the night? That's a misdemeanor? And it's not just a high crime area. You have the objective fact that a homicide has been committed within the past ten days or two weeks. And you have a history of homicides here. And those are objective facts. Homicide is an objective fact that it's a crowded area. We can, I assume, take judicial notice of the fact that these were not cat guns that fired the shots. They were live bullets. And can we take judicial notice of the fact that bullets kill people? I totally agree with the judge. I think he's right. And that's exactly where I'm going with it. And I also would add, I don't think he means to say that if there's a homicide committed, that those citizens in that area become second-class citizens either. Homicides are committed all over the place. Actually, the citizens in that area called in to complain. They wanted to be protected like every other citizen. When you get calls from a place of high crime, that happens all the time. People are calling because it's high crime. They're calling all the time, not just for this. So if their Fourth Amendment rights are suspended because there's a recent crime in a place where there's a high crime area, those citizens will have Fourth Amendment rights less frequently than the people who live in a different neighborhood, which I think is troubling as well. I would say the Supreme Court has noted that the fact that a crime has been committed nearby, for example, in ward law, or a presence in a high crime area, is not suspicion. And as I noted, the actual circumstances... Why don't they just move out of there? If they don't want to be in the area of high crime, they know the rights could be down. If you fire a gun, you're going to lose rights in there. Then I guess the implication is why not just move out? I think there's complicated socioeconomic and historic reasons for that, Your Honor. That's way beyond the record. Go back to the example, if you would, that Judge Wynn gave you, because I wasn't sure of your answer. Someone's outside the courthouse now. They fired five or six shots. Same facts generally as we have in this case. Capital Police and the Richmond Police get there in 30 seconds. They have all these folks out on the street. There was no murder here two weeks ago, but I know of. So is there a Fourth Amendment violation when the police officers start to search the people on the street in that vicinity? Yes. This is another point I'd like to note. The burden is on the government to justify a warrantless seizure or search. They have to show that it falls within a well-delineated and recognized exception to the Fourth Amendment. There is no case that I am aware of that has allowed for the dragnet, suspicionless seizure or search of individuals for being in the vicinity of a crime, even within a minute of the crime. You need reasonable, articulable, individualized, and particularized suspicion under Terry and its progeny, under Cortez, under Florida versus J.L. I mean, under a litany of cases that that rule would overrule. Can I ask you a hypothetical? If an officer sees a robber run from a bank, he's just shot somebody in the bank, and he's taken the money, and he hops on a bus, and the bus has eight other people on it. The officer gets on his phone and tells the police officer, stop that bus up ahead, and describes the bus with a number. The police officer stops the bus, and they come on the bus, and they have eight people there, one of whom is the bank robber who shot somebody. Yes. How do they handle it? So, Your Honor, that is a distinct legal issue from the one presented here. I'm not asking you that. I said, how do officers handle that? Just stick with the question. Right, I am. So that is what lawyers are starting to call a group reasonable suspicion case, or somebody referred to it as a murder on the Orient Express case, because you know that one person in a group is the one criminal you see. Isn't that Palacios? Isn't that what happened in Palacios? Yes, it is. Although, Palacios, I think, receives 170 people, which is a much broader group. But, yes, it is. And so, I just, before somebody says that I've conceded, I'd like to know, in this case— What does the Fourth Amendment allow the officer to do? So, I just, again, I'd like to know before I get accused of giving away my case, but in this case, Judge Locke found that there was no reason to believe that any of the men in the field were the shooters. That's my question. And answer, what's your understanding of the Fourth Amendment? What would the officers be allowed to do in that circumstance? I think in that case, there is certainly reasonable suspicion that— Of all eight? Well, and in your case, they have a description of the shooter, which is the robber, which I think is— No, they just said he got on the bus. Well, but they saw him leave the bank, right? So, they know what he looked like. I'm saying there's no subscription. The guy got, ran in there. You can say, okay, he had a knapsack and he had a coat and a hat. Right. So, he would be identifiable. But the other men on the bus have a knapsack and a coat and a hat. So, it is just like Palacios, Your Honor, where they had an eyewitness who was going to be able to say when they did, this was a show up in Palacios. They had an eyewitness that said, that's the stabber. Absence identification, you're saying they couldn't do anything. They have to let the bus go, right? I haven't briefed that case because it's not the issue in this case. Well, certainly they could ask, they could talk to everybody. Right. There's no forced amendment violation. And they could have talked to the people here. Exactly. And often when police talk to people, then the people look nervous or they reach for their gun or they look over their shoulder. They do something that creates a reasonable articulable suspicion. Exactly. That's not my hypothetical. My hypothetical is on the bus. And my question is, could the officer safely pat down each one to find which one had the gun? I don't know the answer to that, Your Honor, because under Robinson, this court's on bond decision. The procedure has to be legal before you're free. If it's legal, that's the rule in the circuit. And so, again, I haven't thought about that case. Judge Wilkerson's question on that same kind of thing when you were going into territory. He says, you look and see if they're furted. You see if there are other things that would allow that. Judge Wilkerson. And this is not a bus. But if you go on a bus, you've got that limited opportunity with eight people. You can take your time and look at their faces and see if there's something that would give you that. And then you were gaining the suspicion. That's going to be a fact that is unduly subjective. And we already have cases indicating correctly, in my view, that the fact that someone's nervous in the face of a traffic stop, that that doesn't create the kind of suspicion to undertake a stop and a frisk or even more intrusive measures. But let me ask you one thing, because I'm interested in how the Fourth Amendment intersects with the democratic prerogatives. And it seems to me that this case raises that question. Richmond, at the turn of the century, had an alarmingly high homicide rate. And in response to that, the city government adopted a more proactive police strategy. And from the years, particularly as the proactive strategy went into practice, from the years 2004 to 2011 or 12, the homicide rate dropped substantially. Not as far as we would like to see it, but there was a measurable drop. And certainly the proactive policing was one among several factors that I believe would fairly contribute to it. Now, if you say... I'm sorry, Judge, what were the years you gave to that? What? When you dropped the crimes, what years were they, Richmond? I think they were from about 2004 until about 2011 or 12. And then it's kind of leveled off, but at a lower level than it was at the turn of the century. Now, the question I have is, if you say, as you are inviting us to say in this case, that even the most minimal intrusion in an active shooter situation is forbidden, you are striking at the heart of Richmond's proactive policing policies. And what you're doing is you're restricting the right of these communities to self-governance. Not without restriction, to be sure, but to adopt within a limited range a strategy of proactive policing that has helped to reduce this terrible toll in the cities of taking human lives, each one of which has dignity. And you're leaving communities progressively more helpless to deal with unfortunate conditions that plague us all. And I think you're pushing the Fourth Amendment to a point where it really begins to infringe on democratic self-governance and the latitude that cities should have, within reason, it's not unlimited, to adopt a strategy of proactive policing which has proved effective in many, many places, and particularly in Richmond. And that's a tension you've got to grapple with. So, Your Honor, I can't speak to Richmond Police Department crime statistics that I am not aware of and that are not on the record. But he is fundamentally correct. If you didn't have a Fourth Amendment, you wouldn't have to worry about this stuff. You can go in and search anybody, any place, and historically, as you said, before this country got the Fourth Amendment, that was what was happening. And so he's saying we need to kind of go back to that era before we didn't have a Fourth Amendment. And I would add, Your Honor, the Supreme Court has said repeatedly that the fact that police work may be made more efficient does not dispense with the Fourth Amendment. That's really not persuading me. And, Your Honor, the Fourth Amendment and the Constitution are the supreme law of the country. All I'm saying is that if a democratic government has a strategy of policing that is working and that is responding not just to willy-nilly searches. These are not police on the rampage. These are police engaging in an active shooter situation in the area where the active shooting was occurred, the intrusion being minimal. If even that is wrong, what options and what choices do democratic, duly elected governments have left? They can comply with the Fourth Amendment. They can raise their hand and let the homicide rate just return to where it was. Can I ask you a question? I want to go back to, I think it was Judge Wynn's original hypothetical where the shots were fired in the street outside the courthouse. And I thought Judge Wynn said, can the police go into that street and seize everyone? And I actually think that would be a very different case. If the police went into that street and seized everyone, then we'd be over in that footnote. I can't remember if it was Lidster or the one before it. But, you know, about whether the police can throw up a roadblock and without exercising any discretion, seal off an area. I think that's what happened in Palacios, too. And it's what would happen in the bus. We're sealing off this area. We are not exercising discretion. We are stopping everyone. Then you're more over in the special needs bucket. And there are still questions, I understand, about whether you can do that for a law enforcement purpose. But at least you have the basic, you're within the special needs brown balance that says that kind of a stop is less intrusive because it's less concerning to the citizen, less frightening. You can see it happening to everyone. And you've taken police discretion out of the equation. But that didn't, so that's another alternative that might be available to the Richmond police or any other police. But that's not what happened here, right? I thought the district court made specific factual findings that in addition to the men in the field, there were people closer to the apartments where the police believed the shots to come from. But they didn't try to stop everybody. They made discretionary decisions about which among the citizens on the field would have to give up their, would have to suffer this particular intrusion. And the police got to decide which ones it was on the field. And I thought that made this, the Supreme Court says that makes that kind of a stop much more intrusive than the kind you would have if you just sealed off both ends of a block and stopped everyone. So I agree with everything you just said on that. So that would have been okay. So accept that. Yeah, that's right. So you don't even believe that's true, do you? So Judge Harris just gave a very good description of my outline of the special needs aspect of the case, which we didn't get into yet. But, Your Honor, I think I have the list of six factors. The first special needs checkpoint that was okay was Martinez-Fuerte. And on page 559, they list six things about that checkpoint that made it okay. It wasn't just the international border part. And in six, which was the Michigan commission that set up the drunk driving one, they listed similar things that made that checkpoint okay. In Prowse and in Edmond, those are the two where they were like discretionary checkpoints or more like spot checks that were not okay for the exact discretion reasons that Judge Harris is just speaking to. But aren't those all cases where there's more time? I mean, here, this is almost simultaneous to the shooting fire. You only have a couple of officers. They think there's somebody shot. I don't see how they have a luxury of deliberating. Do we set up a checkpoint here? Are we going to get an additional 20 officers in here? It doesn't seem to me realistic to draw those conclusions from situations that are very factually different from what we have in this case at the moment this individual was seized. I believe now my colleague from the U.S. Supreme Court has now conceded that this is not a special needs doctrine case. But it is correct. And part of the special needs analysis that the Supreme Court upholds is that these checkpoints are established in advance to avoid the discretionary problem. And that's why this isn't a special needs case. It's a mismatch doctrinally. The only ones that are set up sort of more on the fly are from circuits, not the Supreme Court and not this circuit, and they're the sort of bank robber cases. But those cases have particularized suspicion because they all involve GPS trackers on the money, which is so far afield from this case as to, I think, not- But isn't that inconsistent with the idea? And I understand that maybe there's an issue. But Edmund seems to say it's not always true, right? And that's followed up in Lipster. It says where you've got this public safety, it doesn't have to be every route that a terrorist could take. It's a likely route that a terrorist would take. Both the Supreme Court in Edmund and Lipster say you can make those stops without suspicion. I mean, the Supreme Court in Lipster says certain forms of police activity, like public safety, do not require suspicion. So in Edmund, the holding in Edmund is the checkpoint in Edmund is unconstitutional. In Lipster- But you and I have talked about the language before. And before, I think you sort of said it was dicta, and maybe it is. But the language in Edmund says very clearly that, you know, a fleeing suspect or a potential terrorist that law enforcement, without suspicion, can put up a stop. Not a programmatic stop, right, but specifically for that felon, specifically for that attack. Well, again, there's some version of suspicion. And if I can address Lipster, I'd really like to address Lipster. Lipster refers to the Edmund rule as a presumption of unconstitutionality. And Lipster, the reason that the checkpoint in Lipster was okay, there's two primary reasons. The first one dealt very strongly with the government interest in regulating motorists and highway safety, which is not an issue here, obviously. The second one is equally as important, I think, and again, highly relied on by the Supreme Court. The checkpoint in Lipster was acceptable because they were not seeking to investigate the people they stopped. It was to start an encounter with motorists to seek information about other people. It would be akin to starting a voluntary encounter, but with a car. The only way to do that is to stop the car. But it analogizes that information gathering to public safety. I mean, it says, yeah, that's information gathering, but Lipster says that's the equivalent of a public safety rationing. And so with the pedestrian, Your Honor, the equivalent of that, as it says this in Lipster, is a voluntary police citizen encounter, not a seizure. So there's nothing about Lipster that makes the stop of Mr. Curry legal. Your view is that Lipster's just limited to cars, that it doesn't apply to pedestrians? It relies very heavily, yes, on the fact that it's a motorist. And also it says that it's akin to a voluntary police citizen encounter. And so I think for those two reasons, Lipster does not legalize the stop of Mr. Curry, which is the question here, at all, for two distinct reasons, and certainly together, but I think either of them would. But the point is traffic checkpoints don't require individualized suspicion. It's a situation where the intrusion on a motorist is likely to be greater than having someone raise their hand. And yet those traffic checkpoints do not require individualized suspicion. But they require the cars to stop. They require the license to be displayed. They require registration to be displayed. There is an intrusion there, a greater intrusion than here. And there is no requirement of individualized suspicion under the Supreme Court's decision. So, Your Honor, as an initial matter, my friend from the U.S. Attorney's Office disclaimed raising special needs as a done exception. And also I would disagree that having to remove your clothing is a lesser intrusion than stopping your car. Also insists it was a program set up in advance, unlike here, which is an ad hoc stop of a pedestrian. And frankly, Your Honor, the litigation strategy of the U.S. Attorney in this case, I think Judge Diaz, I think, recognized this earlier. They waived the Terry appeal. I do not know why. But their strategy in this case, for whatever reason, is to do that. And so it's made the facts of this case a mismatch for what they've argued. And this case could have been resolved a different way. But for whatever reason, they've pursued one argument. It's that the exigent circumstances exception, as Judge Winn was talking about, would allow for the stop and then frisk of anyone in the vicinity of a shooting. And that is contrary to ward law. It is contrary to the entire line of Terry cases, including notably Florida v. J.L. It's just never been allowed. And the government has the burden to show that a warrantless stop is constitutional. The district court ruled that they failed to show that. And we would ask the court to affirm it. I'd also like to add one other point. Let me just ask. I'm misunderstanding. Do the facts show that somebody had to take his clothes off? I thought they just raised their sweatshirt to see if there was a gun in the waistband. Yeah, so revealing part of their body. Yes, that's what I meant. Revealing part of their body. They pulled up their shirt to show the waistband. I don't think that's nonintrusive, Your Honor. Okay. But I'm just suggesting that intrusion of taking off your clothes is a lot different. Not even taking off your clothes. Basically just showing your waistband with a flashlight. It took less than a minute. In the background, did you hear what I'm saying? Get down, get down. Yes, Your Honor. The seizure was immediate on jump out of the car. If I could address also some of the questions to my colleague from the U.S. Attorney's Office. I made this point very clearly in the hearing session. This idea of a general reasonableness under the circumstances test for police action seems to be something that comes up quite a bit in Fourth Amendment cases. This question was presented squarely to the Supreme Court in Dunaway v. New York. I've quoted the language at length in my re-hearing petition. The court said, the government is asking us for an exception, I'm paraphrasing, that is reasonable police action under the circumstances. The Supreme Court, in a majority opinion for the court, rejected that request. The test is not reasonable police. That is not an exception. Reasonableness is not its own freestanding exception. The police action has to fall within an existing exception and be reasonable. So Dunaway sort of forecloses that avenue of argument from the U.S. Attorney's Office as well. So, if I may, in conclusion. As the Supreme Court held in Gantz, warrantless stops and searches are per se unreasonable. And the accident and circumstances doctrine has never allowed for a suspicionless seizure of a person. The Terry Doctrine does allow for investigative seizures of persons, but the Department of Justice weighs that argument. The United States here also does not argue that there was suspicion, whether as to Mr. Curry or to any of the other men in the field. But rather, that suspicionless seizures should be allowed just in the vicinity of a rape crime. This is unprecedented. It's not within any understanding of the Fourth Amendment, whether originalist or common law. To quote the United States' own brief in Utah v. Strafe, a police force was dragged into detention of members of the community on no suspicion, close quote, would be, open quote, a flagrant violation of the Fourth Amendment. So, for those reasons, if there are no further questions, we would ask the Court to affirm the District Court's very careful and well-reasoned opinion. Thank you, Counsel. Mrs. Cook, you have some time reserved. Mr. Cook, what would you say is your best case supporting you based on an exigent circumstances theory? If I can, I'd like to answer that in two steps. The first step is there is a misunderstanding, I think, from my friend about the basic analytical framework here. Her view is that the Supreme Court has never applied the factors from Brown in exigent circumstances cases. That's simply incorrect. The Supreme Court hasn't cited specifically Brown. But in Illinois v. MacArthur, there's two very short passages that I would direct the Court to. First, Illinois v. MacArthur says, quote, that the case involves a plausible claim of specially pressing for urgent law enforcement need, i.e., exigent circumstances. So, Illinois v. MacArthur, definitely an exigent circumstances case. The Court then goes on to say, we balanced the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable. That is a clear illustration of Brown balancing. And the Court's analysis in that case where they go on to say, well, look, there was strong evidence of crime in the trailer. Good reason to believe the defendant would destroy the evidence while they went for a warrant. They took reasonable steps to reconcile the balancing of government interests against the defendant's privacy interests because they just detained him for two hours. And so it was reasonable. I'm sorry, but I would really like an answer to Judge Agee's question because that was my question, too. And if you have two best cases, that's fine. But if you could just tell us, because the case you were describing doesn't sound very close to this one, too. But it's your best case, that's fine. I'm prepared to write it down and look at it again. So Illinois v. MacArthur is a case that establishes a legal football that says, look, we're going to do this balancing test. And that's how analytically we're going to handle it. Are there any cases that we look to and we would say, yes, the government has to win here? That's what I want to know. Right. And is Illinois v. MacArthur, is that the case that we look to and we say the government has to win on these facts? No, that's the case that tells you what test should be applied. The case that tells us you win on these facts. In terms of what is the case once you've established the analytical framework on these facts, all of these cases, I will acknowledge, there is not a case that is just like this in terms of there is a police response within 35 seconds to gunfire. This is, okay. Maybe it's a better fact. How about one or two that you, obviously they're not going to be the same thing, but it's the closest analogy we can draw. Right. So Mora deals with a, this court's opinion of Mora is an exigent circumstances case that deals with police response to imminent threat of injury to people. And it allows a police response. Again, as a matter of analytical principle, a case that Judge Wilkinson cited, Morgan v. Hayden, which was decided in 1967, close in time to Terry, Joseph Brennan endorsed in an exigent circumstances case that was dealing with danger. He said that the breadth of the police response in conducting a search in that case was as broad as may be reasonably necessary to prevent the dangers. Mr. Cook, we've all, everybody in this room, at least up here, has written briefs. And you know you can get language from a brief, from a Supreme Court case, and it's helpful to you. And I'm not, this isn't a trick question. I really just want to be sure that I read the two, three cases that you think control here and make our decision here to reverse clear. Right. So they are Illinois v. MacArthur. Is that right? Mora. And this Wheaton v. Hayden. Those are the cases? Warden v. Hayden. Warden v. Hayden. There is not a case that is factually just like this. There's never a case that's factually like this. Let me just tell you. We've been doing this a long time. Some people here have been doing it even longer. There's never a case exactly like this. Can I just refine the question? Are there any cases, and again, I'm not trying to trick you or anything. I want to make sure I'm not missing anything. Are there any cases where the court applies exigent circumstances to allow a suspicionless search or seizure on a discretionary basis, not in sort of a roadblock situation where the police don't have discretion? From this court, I think a case that is pretty helpful is Judge King's opinion in the state. In that case, police were responding to gunfire that had occurred recently. They detained people who were not thought to be, per se, the shooters. They were being detained to create a safe environment in which people could conduct the investigation.  So, based on the need to conduct their investigation of the shooting incident in a reasonably safe environment, the initial half-hour detention of the figs constituted a measured and proportionate response. I think that that applies equally here. Now, granted, it's different in that this is police arriving on the scene where they are trying to immediately address a danger that is unfolding in front of them. In the same way that happened in Brigham City, that was a case where the police are responding to a fist fight. Yeah, but there was a suspicion. There was sort of an objective, articulable reason to go into that house and not some other house. So, I'm really kind of stuck on the question of where there is neither individualized suspicion. You don't have that. And you also don't have something in the nature of a roadblock where it's happening to everybody on the scene. The police are deprived of discretion to proceed among citizens, basically to search based on a hunch that doesn't rise to the level of articulable suspicion. Are there cases like that? But it sounds like fig is like that. Fig is like that. But I think that what is going on in this case is that you are, as the Supreme Court said in Illinois versus MacArthur, applying this balancing test. Because you have such a significant government interest here, which is preventing loss of life from a shooting that has just happened, the critical question is what steps are going to mitigate that danger to people on the scene. Using very limited intrusions and figuring out who has the gun when they arrive in such a dangerous circumstance is really a tailored and narrow and it was short in duration kind of response. Well, Mr. Cook, it sounds like what you're saying then is that if there are exigent circumstances, you don't need any articulable suspicion. Is that your proposition here? No, I wouldn't go that far. And I think that's a really important point. So what has to be true in exigency is rather than asking yourself about the question of who committed the crime as the ultimate issue, the issue is what is going to protect people and reduce danger. And in that scenario, where you have really dangerous circumstances, like worse than a stabbing or a fist fight, there the question, what's going to protect people from loss of life and really serious harm, that's where the tailoring occurs. And this is why this test is going to work. Counsel, to help me understand, because that sounds like the special needs framework, right? That's saying that when you're applying the Brown test and you're looking at the government interest as the first of the three things that you look at, what you suggested to Judge Keenan, I gather, I'm just trying to interpret what you're saying, is that suspicionless flashlight search is appropriate here because it's not focused on catching the bad guy but protecting the public safety. And that sounds like the special needs context, which I gather now that you've said you've abandoned. I'm just having trouble. It seems like you're importing that analysis into the first Brown factor as part of your exigency analysis. So they're connected. Maybe you're not relying on it as a distinct doctrine, but it seems to be incorporated in the first Brown factor for you. Is that right? That is right, but let me clarify, if I may. So cases like Michigan's Taylor or Tyler, which is the police response to fire, are illustrating the point that under exigency doctrine, you are allowed to do things that protect people from serious injury. And so then you have this question about what's going to protect people from serious injury. And sometimes the answer to what is a reasonable measure is not going to turn on particularized suspicion. It's going to turn on what is a limited, reasonable measure to reduce the danger. True, but exigency also, and Chief, I apologize. I know you wanted to finish quick, but exigency includes protecting people, but it also includes non-protecting people, right, like the destruction of evidence. That, in some context, is an exigent circumstance. And it seems like to me you're trying to draw a distinction in the first prong of Brown analysis between the exigencies that protect human life or public safety, and we can talk about facts, but doctrinally, the exigency that protects public safety versus exigencies that are merely law enforcement, gathering evidence that might be destroyed is sort of a primary example. And you're distinguishing between those in the first prong of the Brown balancing test. And that distinction, it strikes me, is the very distinction that the court looks at in Lidster in distinguishing between a checkpoint that is focused on law enforcement objectives, that's admins, a drug interdiction, versus a non-law enforcement interest, which the court in Lidster describes as information gathering or public safety. That's the distinction you seem to be drawing. What am I missing? So I think the key thing is to go and look at these exigency cases like Brigham City, and the court is saying that as a matter of applying the Brown balancing in the context of exigency doctrine, police are not entitled to take steps to prevent loss of life. And then you just have to ask yourself what Justice Brennan said a long time ago. The police powers are as broad as may be reasonably necessary to prevent the danger. So the question this court is going to be asking itself in applying exigency to danger to people scenarios is what is reasonable to prevent the danger to people. And in a shooting case, figuring out within seconds of the police arriving on the scene who is armed is a perfectly reasonable, in fact, the best thing the police could possibly do. And here they did it in a minimally intrusive way. I see that my time is up. I want the court to have other questions. Thank you, Mr. Cook. I'll ask the clerk to recess the court. We'll come down and read counsel. This honorable court will take a brief recess.
judges: Gregory, Wilkinson, Niemeyer, Motz, King, Agee, Keenan, Wynn, Diaz, Floyd, Thacker, Harris, Richardson, Quattlebaum, Rushing